# Exhibit 3

STATE OF NORTH CAROLINA

DURHAM COUNTY

UNITED THERAPEUTICS
CORPORATION and LUNG
BIOTECHNOLOGY PBC,

          Plaintiffs,

v.

LIQUIDIA TECHNOLOGIES, INC.
and ROBERT ROSCIGNO,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 4094

**MEMORANDUM IN OPPOSITION TO DEFENDANT ROBERT
ROSCIGNO'S MOTION FOR SUMMARY JUDGMENT**

**<u>PUBLIC VERSION</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... iii

STATEMENT OF FACTS ...................................................................... 2

    I.     UTC employed extensive measures to protect the trade secrets related to its cutting-edge work. .................................................... 2

    II.    One measure UTC used to protect its trade secrets involved Roscigno's employment agreements. ............................................ 8

    III.   Roscigno was subject to additional restrictions evidencing UTC's extensive measures to protect its trade secrets.......................... 11

    IV.   Roscigno further violated his ongoing obligations under UTC policies and his UTC employment agreement. ........................................ 12

    V.    Roscigno's misappropriation of UTC's trade secrets comes to light. .......... 13

ARGUMENT ...................................................................................... 14

    I.     Legal Standard. ............................................................................ 14

    II.    Roscigno's trade secret misappropriation commenced the moment he left with UTC's trade secrets and continued for years................................ 14

    III.   Roscigno's surreptitious deletion of UTC documents in 2021 demonstrates that he knew he was not authorized to have them.............. 15

    IV.   Roscigno's 2007 Agreement is not permission to steal UTC's trade secrets and use them after three years....................................... 17

         a.  Section 10 does not override Section 9 to create a three-year expiration date for UTC's trade secrets. ................................. 18

         b.  Regardless of how the Court interprets Sections 9 and 10 of the 2007 Agreement, factual disputes preclude granting Roscigno's motion for summary judgment. ........................................... 19

         c.  Roscigno asks the Court to draw a bright line regarding time-limited confidentiality provisions that is inconsistent with North Carolina law. ..................................................................... 21

         d.  The North Carolina caselaw cited by Roscigno is inapposite............... 24

e.  Courts in other jurisdictions likewise disfavor a bright-line rule
    regarding time-limited confidentiality provisions. ............................... 27

V.  Roscigno's remaining arguments depend on a faulty interpretation
    of the 2007 Agreement..................................................................... 29

CONCLUSION............................................................................................... 31

RULE 7.8 WORD COUNT CERTIFICATION ............................................. 33

CERTIFICATE OF SERVICE ....................................................................... 33

Case 1:25-cv-00299-TDS-JLW    Document 26-3    Filed 06/20/25    Page 4 of 39

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Aeroflow Inc. v. Arias*,
    2011 NCBC 20, 2011 WL 2651567 (N.C. Super. Ct. July 5, 2011).........................29

*Alta Devices, Inc. v. LG Elecs., Inc.*,
    343 F. Supp. 3d 868 (N.D. Cal. 2018)......................................................................27

*Artistic S. Inc. v. Lund*,
    2015 NCBC 109, 2015 WL 8476587 (N.C. Super. Ct. Dec. 9, 2015).................20, 23

*Combs & Assocs., Inc. v. Kennedy*,
    147 N.C. App. 362 (2001) ......................................................................................21

*Computer Design & Integration, LLC v. Brown*,
    2017 NCBC 8, 2017 WL 442691 (N.C. Super. Ct. Jan. 27, 2017)..........................24

*Computer Design & Integration, LLC v. Brown*,
    2018 NCBC 128, 2018 WL 6609014 (N.C. Super. Ct. Dec. 10, 2018)..............22, 25

*CT Int'l, Inc. v. Zwerlein*,
    228 Wis. 2d 343 (1999) ..........................................................................................28

*Curtiembre Becas, S.A. v. Arpel Leather Corp.*,
    No. 1:05CV622, 2007 WL 9751828 (M.D.N.C. May 2, 2007)................................23

*DB Riley, Inc. v. AB Engineering Corp.*,
    977 F. Supp. 84 (D. Mass. 1997) ...........................................................................28

*Dobson v. Harris*,
    352 N.C. 77 (2000)................................................................................................14

*FrontRunner HC, Inc. v. Waveland RCM, LLC*,
    No. CV 20-10230-DJC, 2020 WL 7321161 (D. Mass. Dec. 11, 2020)..............27, 28

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*,
    No. CV0800788SJOPJWX, 2009 WL 10671420 (C.D. Cal. May 22, 2009) ...........27

*Morrell v. Hardin Creek, Inc.*,
    371 N.C. 672 (2018)...............................................................................................14

Case 1:25-cv-00299-TDS-JLW    Document 26-3    Filed 06/20/25    Page 5 of 39

*Safety Test & Equip. Co. v. Am. Safety Util. Corp.*,
    2015 NCBC 37, 2015 WL 1880769 (N.C. Super. Ct. Apr. 23, 2015)..... 22, 23, 25, 26

*Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*,
    362 N.C. 269 (2008) ...................................................................................... 19

*State v. Capers*,
    208 N.C. App. 605 (2010) ............................................................................ 17

*Static Control Components, Inc. v. Darkprint Imaging, Inc.*,
    200 F. Supp. 2d 541 (M.D.N.C. 2002) ........................................................ 21

*Structured Capital Solutions., LLC v. Commerzbank AG*,
    177 F. Supp. 3d 816 (S.D.N.Y. 2016) .......................................................... 27

*TaiDoc Tech. Corp. v. OK Biotech Co.*,
    2016 NCBC 26, 2016 WL 1221425 (N.C. Super. Ct. Mar. 28, 2016)...................... 22

*TSG Finishing, LLC v. Bollinger*,
    238 N.C. App. 586 (2014) ............................................................................ 21

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*,
    125 N.C. App. 174 (1997) ............................................................................ 20

*Wood-Hopkins Contracting Co. v. N.C. State Ports Auth.*,
    284 N.C. 732 (1974) ...................................................................................... 17

*Wright v. LoRusso*,
    2023 NCBC 64, 2023 WL 6128053 (N.C. Super. Ct. Sept. 19, 2023) ...................... 21

### <u>Statutes</u>

N.C. Gen. Stat. § 66-152 .......................................................... 12, 15, 20, 29

# INTRODUCTION

Defendant Robert Roscigno's motion for summary judgment rests on a single, faulty argument: the three-year confidentiality provision in Section 10 of his 2007 employment agreement permitted Roscigno to walk out the door with a thumb drive of UTC's trade secrets when his employment ended, hold those trade secrets in wait for three years, and then use those trade secrets in work for competitors. This argument is nonsensical; it turns a confidentiality obligation into a license to pillage.

Roscigno himself did not believe he had carte blanche to steal UTC's trade secrets and use them after three years. Forensic analysis of Roscigno's Liquidia-issued laptop (an analysis Defendants fought vigorously to prevent) establishes that when, in 2021, UTC gave notice of its intent to bring a trade secret misappropriation claim, Roscigno rushed to delete the very documents he now argues he was entitled to keep and use. Roscigno's attempt to delete UTC's trade secrets from his computer demonstrates that not even Roscigno believed he was entitled to retain them after his departure from UTC. Having failed to scrub the incriminating evidence, Roscigno should not be permitted to claim entitlement to the same documents he tried to destroy.

Moreover, Roscigno's argument disregards both contradictory facts and the law. Other provisions of the employment agreement with no time limitation specifically address UTC's trade secrets. And UTC implemented measures beyond contractual restrictions to protect its trade secrets. Notably, UTC's Employee Handbook and Technology Policy explicitly prohibited taking UTC information, and

Roscigno acknowledged that these requirements governed his conduct. Under North Carolina law, these other measures must be considered. Roscigno's motion should be denied.

**STATEMENT OF FACTS**

**I.     UTC employed extensive measures to protect the trade secrets related to its cutting-edge work.**

UTC is a biotechnology and pharmaceutical company that develops and commercializes products that address chronic and life-threatening conditions. UTC focuses on cardiovascular and pulmonary diseases, pediatric cancers, and organ replacement. UTC's products include Remodulin® (treprostinil) Injection and Tyvaso® (treprostinil) Inhalation Solution for the treatment of pulmonary arterial hypertension. United Therapeutics Corporation, Annual Report (Form 10-K) at 3 (Feb. 22, 2023) (SJ1584).

Since its formation in 1996, UTC has grown from a startup employing dozens of individuals to a publicly-traded company employing about 1,000 individuals. *Compare, e.g.*, United Therapeutics Corporation, Annual Report (Form 10-K) at 1, 11 (Mar. 21, 2000) (SJ1529, 1539) (reflecting that it had 63 employees as of Mar. 15, 2000), *with* United Therapeutics Corporation, Annual Report (Form 10-K) at 29 (Feb. 22, 2023) (SJ1610) (reflecting 985 employees as of Dec. 31, 2022). Throughout the nearly three decades that it has operated, UTC has maintained stringent practices to protect its trade secrets.

UTC's efforts to maintain the secrecy of its trade secrets include, but are not limited to:

- 2 -

- Requiring employees to keep UTC information confidential, including requiring employees to agree to protect UTC information as a condition of employment. UTC Resp. to Liq. Rog. 21 (SJ1249-1250); *see also, e.g.*, UTC 2006 Employee Handbook, Confidentiality and Non-Disclosure provision at 9 (SJ1394) ("It is the policy of United Therapeutics to ensure that the operations, activities, and business affairs of United Therapeutics are kept confidential. If employees acquire confidential or proprietary information about United Therapeutics, it must be kept in strict confidence and not be used or disclosed to any other person or entity except as required in the performance of United Therapeutics' duties or as otherwise expressly authorized by United Therapeutics.").

- Including confidentiality and non-competition provisions in employment agreements. UTC Resp. to Liq. Rog. 11 (SJ1226-1228).

- Obligating employees to assign to UTC intellectual property rights developed during the course of employment. *Id.*; *see also* UTC 2007 Employee Handbook, Intellectual Property Rights provision at 16-17 (SJ1456-1457); UTC 2006 Employee Handbook, Intellectual Property Rights provision at 16 (SJ1401).

- Issuing policies, including a Technology Policy, explicitly stating that UTC media is company property to be used for UTC's benefit alone. *See, e.g.*, UTC 2005 Technology Policy § 1.2 (SJ1496) ("[A]ll employees and everyone connected with the company should remember that electronic

- 3 -

media and services provided by the company are company property and their purpose is to facilitate and support company business."); *id.* §§ 2.1, 2.7 (SJ1496-1497) ("Electronic media cannot be used for knowingly transmitting, retrieving, or storing any communication . . . for any purpose that is illegal or contrary to United Therapeutics' policies or business interests.").

- Requiring that "[a]ll company property and equipment in the employee's possession or control must be returned prior to the employee's last day." *See, e.g.*, UTC 2007 Employee Handbook at 8 (SJ1448); UTC 2006 Employee Handbook at 8 (SJ1393).

- Requiring employees to act ethically. UTC Resp. to Liq. Rog. 21 (SJ1250); *see also, e.g.*, UTC 2006 Employee Handbook at 9-10 (SJ1394-1395) (Code of Conduct and Ethics requiring, *inter alia*, compliance with "all policies and procedures of United Therapeutics" and "responsible use of and control over all United Therapeutics' assets and resources employed or entrusted to such individual").

- Not publishing information in order to retain its confidentiality and trade secret status. UTC Resp. to Liq. Rog. 11 (SJ1226).

- Marking documents as "confidential" when appropriate. *Id.* (SJ1226).

- Restricting access to confidential, strategic, intellectual property and trade secret information contained in paper documents through various security measures, including, but not limited to, maintaining such

- 4 -

documents in locked file rooms and locked file cabinets within a facility that restricted access to UTC's portion of the building, required key card entry, and/or employed personnel who monitored entry activity. *Id.* (SJ1226-1227); UTC Resp. to Liq. Rog. 21. (SJ1249-1251).

- Restricting access to confidential, strategic, intellectual property and trade secret information contained in electronic documents through multiple security measures, including, but not limited to, maintaining such documents on UTC password-protected devices and servers where they were only available to individuals subject to non-disclosure obligations and where access differed based on the individual's job function and contract term. UTC Resp. to Liq. Rogs. 11 & 21 (SJ1226-1227, 1251-1253); von Kessler Sept. 19, 2023 Dep. Tr. 57:19-58:11 (discussing UTC's security policies regarding laptop use, including passwords and VPN) (SJ86); UTC 2005 Technology Policy § 15.1 (SJ1502) ("United Therapeutics limits system/network access to authorized persons only. These include (but are not limited to) full-time and part-time employees and consultants. Access differ[s] based on job function and term of contract. For instance, IT consultants such as web developers may be given restricted access to one device (e.g. the web server). These accounts are set to expire upon conclusion of the corresponding work and activities are closely monitored.").

- Restricting use of data storage devices to protect sensitive information, UTC 2005 Technology Policy §§ 10.1, 11.1, 11.2 (SJ1501) (requiring safeguarding at all times removable electronic media containing certain information, secure erasure before re-use or disposal of such devices, and removal of non-volatile memory items before disposal), despite thumb drive usage not being prevalent at UTC. Friedrich Sept. 22, 2023 Dep. Tr. 81:13-87:01 (SJ0003).

- Using non-disclosure agreements ("NDAs") with third-parties exposed to sensitive information. UTC Resp. to Liq. Rog. 21 (SJ1249-1252); *see also, e.g.*, von Kessler Dep. Tr. 223:25-225:2 (SJ90) (discussing UTC's practices regarding confidentiality agreements with third parties).

- Conducting training concerning UTC's expectations regarding confidentiality. Byrd Sept. 15, 2023 Dep. Tr. 45:01-55:10, 101:03-102:05 (SJ0097); Friedrich Dep. Tr. 166:14-167:03, 239:08-240:13 (SJ0053).

- Maintaining at all times policies, training, and a culture geared towards protecting the confidentiality of its information. Rothblatt Aff. ¶ 5 (SJ1525).

- Conducting exit interviews with departing employees to, *inter alia*, remind them of continuing obligations and requirements to return company property. UTC Resp. to Roscigno Rog. 20 (SJ1314-1318); Friedrich Dep. Tr. 90:8-101:22; 108:10-109:20 (SJ12) (explaining that UTC always provides exit information to departing employees and

- 6 -

makes a concerted effort to ensure company property is returned), 146:18-147:19, 149:15-22, 156:11-13, 194:8-9 (further testimony regarding UTC's requests that departing employees return all company property when they leave).

UTC employees testified at length regarding measures in place at UTC to protect its information. *See, e.g.*, Byrd Oct. 17, 2023 Dep. Tr. 11:16-13:10, 22:2-23:23, 43:20-45:07, 63:25-64:14, 79:25-80:13, 114:23-115:11, 140:16-141:02; 152:04-15 (SJ120) (discussing UTC's efforts to secure, maintain, and protect its information); Byrd Sept. 15, 2023 Dep. Tr. 54:2-55:10 (SJ104) (same), 87:17-88:06 (discussing how Byrd personally would ensure the confidentiality of information); Friedrich Sept. 22, 2023 Dep. Tr. 149:15-151:21, 154:10-155:09, 158:16-19, 187:8-21, 192:17-193:02, 201:16-202:15, 254:07-255:17 (SJ41) (explaining multiple ways UTC protects its information); Silverman Sept. 13, 2023 Dep. Tr. 42:04-43:07 (SJ155) (describing employee obligations to UTC post-employment); 76:12-79:17 (describing protection measures for a trade secret); Bunce Aug. 31, 2023 Dep. Tr. 56:03-12, 146:10-22 (SJ167) (describing employees' ongoing obligation to maintain the confidentiality of UTC work product).

UTC experts have opined that the steps UTC took in and around 2007 to protect its confidential and trade secret information were reasonable and industry-standard at the time. Troy Rep. ¶¶ 78-86 (SJ694); Troy Feb. 14, 2024 Dep. Tr. 313:11-315:19, 319:09-329:18, 338:03-345:21, 351:03-352:16 (SJ176); *see also* Johnson Feb. 9, 2024 Dep. Tr. 156:10-158:05 (SJ201).

- 7 -

UTC did not ask (or allow) its employees to make judgment calls on their own about what information should be protected; <u>all</u> company information was considered highly confidential and was not to be shared outside the company without authorization and protection. UTC <u>never</u> permitted—and would never have permitted—employees to retain or take confidential UTC documents on USB drives with them after their departure. Rothblatt Aff. ¶ 7 (SJ1526).

## II. One measure UTC used to protect its trade secrets involved Roscigno's employment agreements.

Roscigno began working for UTC[1] in March 1997 as a Clinical Research Scientist. ECF No. 212.1 § 1. Roscigno's employment agreements—one in 1997 and one in 2007—both provided multi-level safeguards and obligations to ensure that UTC maintained ownership and control of trade secrets.

Roscigno's 1997 agreement provided that he could not disclose, use, or retain trade secrets and myriad other items—both existing within Roscigno's knowledge by virtue of his work for UTC and in physical form reduced to writing. *Id.* § 4.

In March 2007, Roscigno entered into a new employment agreement as President of Lung Rx (the "2007 Agreement"). *See* ECF No. 212.3. This is the agreement on which Roscigno's current argument rests. The 2007 Agreement included two sections governing Roscigno's obligations with respect to UTC's intellectual property and confidential information (Sections 9 and 10).

---

[1] Roscigno was employed by LungRx, Inc. a wholly owned subsidiary of UTC.

Section 9 addressed Roscigno's obligations with respect to UTC's "Intellectual Property." *Id.* § 9. The 2007 Agreement defines Intellectual Property as including trade secrets:

> [A]ll inventions, discoveries, materials, authorship, derivatives and results and proceeds of Executive's efforts in any form or media, including without limitation, all domestic and foreign patents, <u>trade secrets</u> and copyrights in and to all inventions, processes, written works, and other forms of intellectual property.

*Id.* (emphasis added). Intellectual Property, including trade secrets, is separate and distinct from "Confidential Information," a term defined elsewhere in the 2007 Agreement. *See id.* § 10(b).

Section 9 makes clear that Intellectual Property, including trade secrets, is exclusively owned by UTC, not Roscigno. *Id.* § 9. UTC's ownership of Intellectual Property—and Roscigno's concomitant obligations with respect to UTC's trade secrets—are not limited by time. *See id.* Section 9(a)(3) addresses Roscigno's obligations with respect to UTC's trade secrets, providing: "Executive shall also take whatever steps are necessary to sustain United Therapeutics' claim to such trade secrets, including but not limited to . . . maintaining the confidential nature of any such discoveries or creations . . . ." *Id.* § 9(a)(3). Roscigno's obligation to sustain UTC's trade secrets is likewise not time-limited. *Id.* § 9(a)(3).

Section 10 covers the more general category of "Confidential Information," which is different from, but may overlap with, "Intellectual Property." *Compare id.* § 9 (defining Intellectual Property, which specifically includes trade secrets), *with id.* § 10(b) (defining Confidential Information). "Confidential Information" encompasses

a broad range of "information," including information in Roscigno's head by virtue of his work at UTC:

> "Confidential Information" shall mean each of the following: (a) any information or material proprietary to the Company or designated as confidential either orally or in writing by the Company; and (b) any information not generally known by non-Company personnel; and (c) any information which Executive should know the Company would not care to have revealed to others or used in competition with the Company; and (d) any information which Executive made or makes, conceived or conceives, developed or develops or obtained or obtains knowledge or access through or as a result of Executive's relationship with the Company (including information received, originated, discovered or developed in whole or in part by Executive) from the initial date of Executive's employment with the Company.

*Id.* § 10(b). Thus, there may be overlap between Confidential Information and trade secrets, but Confidential Information is broader and more general.

Section 10 outlines Roscigno's obligations with respect to "Confidential Information" for the three years following his termination. *Id.* § 10(a). Again, Section 10 does not address "Intellectual Property," including "trade secrets." Instead, Section 10 essentially memorializes Roscigno's fiduciary duties to UTC and prevents him from immediately leaving for a competitor and using the knowledge in his head and the skills gained by working for UTC.

At no point during the discussions leading up to the 2007 Agreement did Roscigno and UTC discuss or negotiate Roscigno's ability to retain or take UTC documents with him after he left UTC. He never asked for that authority, and UTC never gave him that authority. Rothblatt Aff. ¶¶ 9-10 (SJ1526-1527). It was not the intent of the 2007 Agreement to provide Roscigno with permission to take UTC documents after he left the company and then use them later to compete against

- 10 -

Case 1:25-cv-00299-TDS-JLW     Document 26-3     Filed 06/20/25     Page 16 of 39

a broad range of "information," including information in Roscigno's head by virtue of his work at UTC:

> "Confidential Information" shall mean each of the following: (a) any information or material proprietary to the Company or designated as confidential either orally or in writing by the Company; and (b) any information not generally known by non-Company personnel; and (c) any information which Executive should know the Company would not care to have revealed to others or used in competition with the Company; and (d) any information which Executive made or makes, conceived or conceives, developed or develops or obtained or obtains knowledge or access through or as a result of Executive's relationship with the Company (including information received, originated, discovered or developed in whole or in part by Executive) from the initial date of Executive's employment with the Company.

*Id.* § 10(b). Thus, there may be overlap between Confidential Information and trade secrets, but Confidential Information is broader and more general.

Section 10 outlines Roscigno's obligations with respect to "Confidential Information" for the three years following his termination. *Id.* § 10(a). Again, Section 10 does not address "Intellectual Property," including "trade secrets." Instead, Section 10 essentially memorializes Roscigno's fiduciary duties to UTC and prevents him from immediately leaving for a competitor and using the knowledge in his head and the skills gained by working for UTC.

At no point during the discussions leading up to the 2007 Agreement did Roscigno and UTC discuss or negotiate Roscigno's ability to retain or take UTC documents with him after he left UTC. He never asked for that authority, and UTC never gave him that authority. Rothblatt Aff. ¶¶ 9-10 (SJ1526-1527). It was not the intent of the 2007 Agreement to provide Roscigno with permission to take UTC documents after he left the company and then use them later to compete against

- 10 -

Case 1:25-cv-00299-TDS-JLW     Document 26-3     Filed 06/20/25     Page 16 of 39

UTC—no such terms were agreed to. *Id.* Indeed, it defies belief that a publicly-traded pharmaceutical company would give a former employee carte blanche to take and use trade secrets following employment.

## III. Roscigno was subject to additional restrictions evidencing UTC's extensive measures to protect its trade secrets.

UTC's reasonable efforts to protect its trade secrets were not limited to the terms of his employment agreements. Roscigno—like all UTC employees—was subject to additional requirements, as described above. *See supra* Section I. Specifically, Roscigno was subject to the policies and dictates of UTC's Employee Handbook, which required him to keep UTC information confidential and to return all company property prior to the last day of his employment. *See, e.g.*, UTC 2007 Employee Handbook at 8 (SJ1448); UTC 2006 Employee Handbook at 8-9 (SJ1393-1394); UTC 2004 Employee Handbook at 7-8 (SJ1342-1343). Roscigno acknowledged that he received, read, and understood those policies and obligations and agreed to be bound by any future iterations of the Employee Handbook. *See, e.g.*, Roscigno 2004 Employee Handbook Acknowledgement (SJ1378). Likewise, Roscigno was subject to UTC's Technology Policy, which mandated that UTC media was to be used solely for the benefit of UTC. *See* UTC 2002 Technology Policy §§ 1.A, 2.6 (SJ1491-1492); UTC 2005 Technology Policy §§ 1.2, 2.7 (SJ1496-1497); UTC 2009 Technology Policy §§ 1.2, 2.8 (SJ1505-1506). Again, Roscigno acknowledged that he had read, understood, and agreed to comply with the Technology Policy. *See, e.g.*, 2002 Technology Policy § 10 (SJ1495). And UTC representatives, who conduct exit interviews with, and send exit packages to, all departing employees believe that they followed such standard

procedures upon Roscigno's departure. Friedrich Depo. Tr. 135:5-136:15, 142:19-145:12, 243:5-244:13, 247:4-21 (SJ30) (testimony regarding Roscigno's exit package and exit interview). Additionally, Roscigno remained subject to statutory prohibitions against misappropriation of trade secrets.

## IV.    Roscigno further violated his ongoing obligations under UTC policies and his UTC employment agreement.

In June 2007, Roscigno resigned from UTC without notice or explanation. (SJ1514). As UTC later learned, upon his departure from UTC, Roscigno took at least one external drive full of documents reflecting UTC's trade secrets, *see, e.g.*, Roscigno Sept. 20, 2023 Dep. Tr. 53:03-54:11, 67:08-68:08 (SJ208), violating not only his 2007 Agreement, but also UTC's Employee Handbook and Technology Policy. By acquiring these trade secrets without authority, Roscigno commenced his trade secret misappropriation. N.C. Gen. Stat. § 66-152(1) (defining misappropriation as acquiring trade secrets without authorization).

After departing UTC with its trade secret documents in-hand, Roscigno initially worked at GeNO, LLC, where he asserts that "he worked on unrelated nitric oxide products for several years." ECF No. 213 at 6. Discovery in this case revealed that Roscigno took confidential GeNO documents with him to Liquidia as well. Roscigno Sept. 20, 2023 Depo. Tr. 234:02-243:05 (SJ216); Dep. Ex. 264 (SJ229); Dep. Ex. 265 (SJ239); Dep. Ex. 266 (SJ261); Dep. Ex. 267 (SJ264); Dep. Ex. 268 (SJ391).

On July 25, 2011, less than a year after the three-year term of Section 10(a) of his 2007 Agreement ran, Roscigno began consulting for a UTC competitor, Liquidia.

(SJ1515). Roscigno remained subject to Section 9 of the 2007 Agreement and statutory prohibitions against misappropriation of trade secrets.

Roscigno confirmed in 2017 that he was aware of his ongoing obligations under the 2007 Agreement. (*See* SJ1522-1524 (signed by Roscigno in 2017, referencing "surviving confidentiality obligations imposed by your employment agreement with UTC and its related entities" and stating that such obligations "remain in full force and effect and govern your confidentiality obligations with regard to the confidential information of UTC and its related entities that you were aware of or had access to as of July 31, 2007")).

## V. Roscigno's misappropriation of UTC's trade secrets comes to light.

Roscigno's misappropriation came to light in 2021 when, during patent litigation between UTC and Liquidia, Liquidia produced several of UTC's own documents containing its trade secrets for which Roscigno was a custodian. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755-RGA (D. Del.) (the "Delaware Action"). Counsel for UTC provided notice of its trade secret claims against Liquidia and Roscigno and immediately thereafter moved to amend the complaint in the Delaware Action on June 4, 2021. *See* Delaware Action, ECF No. 109.

Forensic analysis has established that, within days of that notice, Roscigno deleted UTC documents stored on his Liquidia-issued laptop. *See* Johnson Rep. ¶¶ 64-76 & Ex. O (SJ414). Roscigno's attempt to scrub UTC documents from his laptop demonstrates that he knew that he had neither express nor implied consent to possess the UTC trade secrets he had misappropriated.

Discovery in the current litigation has demonstrated that Roscigno repeatedly used the UTC trade secrets he misappropriated in furtherance of Liquidia's work. *See, e.g.*, David W. Feigal, Jr., M.D., M.P.H., Rep. ¶¶ 120-267, p. 87-91 (SJ757); Gregory K. Bell, Ph.D. Rep. ¶¶ 34-47 (SJ902); Johnson Rep. ¶¶ 59-63 (SJ413); *see also* UTC Resp. to Liquidia Rogs. 1, 5, 23 (SJ1139). This is not contested; Roscigno admits that he accessed "his old work and UTC-related information during the time of his employment at Liquidia[.]" ECF No. 213 at 7-8.

## ARGUMENT

### I. Legal Standard.

"A ruling on a motion for summary judgment must consider the evidence in the light most favorable to the non-movant, drawing all inferences in the non-movant's favor." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018). The moving party bears the burden of showing that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense," or that "the opposing party cannot produce evidence to support an essential element of [its] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

### II. Roscigno's trade secret misappropriation commenced the moment he left with UTC's trade secrets and continued for years.

Roscigno engaged in trade secret misappropriation the moment he walked out the door with UTC trade secrets. Trade secret misappropriation is the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade

- 14 -

secret." N.C. Gen. Stat. § 66-152(1). The 2007 Agreement assigned ownership of trade secrets to UTC and required Roscigno to sustain trade secret status. 2007 Agreement at § 9. The UTC Technology Policy in effect during Roscigno's tenure specified that all documents belong to UTC. *See* UTC 2005 Technology Policy § 1.2 (SJ1496). The UTC Employee Handbook further provided that "[a]ll Company property and equipment in the employee's possession or control must be returned prior to the employee's last day." *See* UTC 2006 Employee Handbook at 8 (SJ1393). Roscigno violated these obligations the moment he left with documents reflecting UTC's trade secrets without UTC's authorization.

Pilfering these documents without authorization constituted misappropriation of UTC's trade secrets. He continued to misappropriate UTC's trade secrets when he disclosed and used them during the course of his employment at Liquidia. In one instance, the use was so blatant that he cut and pasted from a UTC document and forgot to replace certain instances of "LungRx" with "Liquidia." *See, e.g.*, UTC Resp. to Liquidia Rog. 1 (SJ1145). These facts alone are sufficient to rebut Roscigno's argument that "there is no misappropriation here." ECF No. 213 at 2.

## III. Roscigno's surreptitious deletion of UTC documents in 2021 demonstrates that he knew he was not authorized to have them.

Roscigno spins a tale of UTC as the "Wild West," where he was allowed to do as he pleased with respect to UTC's trade secret documents. But his conclusory testimony to that effect is contradicted by substantial testimony and documentary evidence from his time at UTC, including Employee Handbooks, policies, and

- 15 -

training. *See supra* Statement of Facts § 1; Rothblatt Aff. ¶ 5 (SJ1526). And his made-for-litigation story is belied by his own conduct.

Undisputed forensic evidence demonstrates that within days of UTC giving notice to Liquidia and Roscigno that they had misappropriated UTC's trade secrets, Roscigno deleted numerous UTC documents from his Liquidia-issued laptop. *See* Johnson Rep. ¶¶ 64, 67-76, Ex. O (SJ414) (showing Roscigno's file access and deletion activity on his Liquidia-issued laptop). Specifically:

- On June 4, 2021, UTC provided notice of its trade secret claims against Liquidia and Roscigno. Delaware Action, ECF No. 109.

- Between June 8 and 13, 2021, Roscigno deleted multiple files and folders containing UTC information. Johnson Rep. ¶¶ 70-76, Ex. O (SJ416). Among the deleted content was a folder entitled, "███████████████" Johnson Rep. ¶ 70 (SJ416). The undisputed forensic evidence shows that this folder had contained at least two UTC documents, (i) "██ ██████████████████████" and (ii) "████████████████ ██████████" as of at least April 23, 2021. *Id.* at ¶ 72 (SJ417).[2]

- On June 9, 2021, Roscigno opened multiple files reflecting UTC trade secrets from a folder entitled, "██████," and its sub-folder "███████████," including "████████████████," "█████ ████████████," and "██████████████████████"

_____

[2] Because the folder was deleted in its entirety on June 8, 2021, it is impossible to know whether those UTC Documents were in the folder at the time of the deletion. Johnson Rep. ¶ 72 (SJ417).

- 16 -

██████████ " *Id.* at ¶ 73 & Ex. O (SJ417). Roscigno deleted the ██████ folder in its entirety 33 seconds after he opened "██████ ████████████████████" Johnson Rep. at ¶ 75 (SJ418).

- On June 13, 2021, Roscigno opened "█ ████████████," another document reflecting UTC trade secrets, before deleting it 28 seconds later. *Id.* at ¶ 76 (SJ418).

Drawing all inferences in favor of UTC, Roscigno's conduct following UTC's discovery of his misappropriation reflects his actual belief that he was not permitted to retain UTC documents.

In short, it is for a jury to decide whether Roscigno's claims of entitlement are true and earnest or whether Roscigno is akin to a real-life manifestation of Lady Macbeth, outwardly maintaining innocence while racked with guilt as reflected by his ham-fisted attempt to destroy evidence. *See State v. Capers*, 208 N.C. App. 605, 616 (2010) ("[T]he evidence suggests a guilty mind and, therefore, is an implied admission by the defendant of his guilt.").

## IV. Roscigno's 2007 Agreement is not permission to steal UTC's trade secrets and use them after three years.

Section 9 of Roscigno's 2007 Agreement makes clear that UTC's trade secrets belong to UTC indefinitely and exclusively. 2007 Agreement § 9 (applying to trade secrets). Because Section 9 specifically addresses trade secrets, to the extent there is any conflict with other provisions of the agreement more generally addressing confidentiality (*i.e.*, Section 10), Section 9 controls. *See Wood-Hopkins Contracting*

*Co. v. N.C. State Ports Auth.*, 284 N.C. 732, 738 (1974) ("[W]hen general terms and specific statements are included in the same contract and there is a conflict, the general terms should give way to the specifics.").

Under Section 9:

> Executive agrees that the entire right, title, and interest, in and <u>to all . . . Intellectual Property</u> . . . which Executive makes, conceives, reduces to practice or develops, in whole or in part, during the term of this Agreement in the furtherance of the Company's business (whether or not made during the hours of employment or with the use of Company's materials, facilities or personnel, either solely or jointly with others), or after termination of employment if such Intellectual Property is based upon Confidential Information, shall be <u>solely and exclusively owned by the Company</u>, its successors licensees and assigns, and no other individual or entity shall have any interest therein of any kind or nature.

2007 Agreement § 9 (emphasis added).

UTC's ownership of its Intellectual Property, including its trade secrets, is not time limited. And Section 9(a)(3) creates an obligation for Roscigno to protect UTC's trade secrets. This obligation also is ongoing and not time limited. Roscigno violated that obligation by taking UTC property and accessing "his old work and UTC-related information during the time of his employment at Liquidia[.]" ECF No. 213 at 7-8.

### a. Section 10 does not override Section 9 to create a three-year expiration date for UTC's trade secrets.

Section 10 applies to "Confidential Information," which again has a separate, more general meaning than "Intellectual Property." *Compare* 2007 Agreement § 10(b), *with* § 9. "Intellectual Property" can be based on Confidential Information but

is not limited to or defined solely by "Confidential Information."[3] This more general provision of the 2007 Agreement does not speak specifically to trade secret information nor does it negate any obligations outside Section 10.

Section 9(a)(3)'s ongoing requirement to protect trade secrets also does not render Section 10's three-year confidentiality term as to Confidential Information meaningless, as Roscigno contends. Section 10 applies to Confidential Information and covers general knowledge, which could exist in a departed employee's mind, whereas Section 9 applies to Intellectual Property, a narrower subset of items that include trade secrets. There is no inconsistency or tension in the plain terms of the 2007 Agreement—which impose a three-year obligation with respect to Confidential Information broadly and an ongoing obligation with respect to Intellectual Property, including trade secrets, specifically.

> **b.** **Regardless of how the Court interprets Sections 9 and 10 of the 2007 Agreement, factual disputes preclude granting Roscigno's motion for summary judgment.**

The 2007 Agreement prohibited Roscigno from misappropriating trade secrets and later using them to compete with UTC. Yet, regardless of how the Court interprets the agreement, summary judgment should be denied.

If the Court concludes that the 2007 Agreement is ambiguous as to whether Section 9 or 10 governs the trade secrets at issue in this case, the jury must weigh the positions and interpret the contract. *See Schenkel & Shultz, Inc. v. Hermon F.*

---

[3] *See* § 9 ("[I]f such Intellectual Property is based upon Confidential Information . . . ."). In fact, Section 9(a)(3), which expressly applies to trade secrets, does not once mention the term "Confidential Information."

*Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008) ("When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury.").

Even if the Court adopts Roscigno's interpretation of the 2007 Agreement, that is just one factor that a jury must consider in determining whether UTC took reasonable steps to secure its trade secrets. "[T]he reasonableness of a plaintiff's efforts to maintain secrecy [is] 'necessarily fact dependent' and [] a trial court must 'closely examine the circumstances surrounding the trade secret.'" *Artistic S. Inc. v. Lund*, 2015 NCBC 109, ¶ 53, 2015 WL 8476587, at *12 (N.C. Super. Ct. Dec. 9, 2015).

North Carolina law requires that multiple factors be considered in determining whether information is a trade secret pursuant to N.C. Gen. Stat. § 66-152(3), including:

> (1) the extent to which the information is known outside the business;
> (2) the extent to which it is known to employees and others involved in the business;
> (3) the extent of measures taken to guard the secrecy of the information;
> (4) the value of the information to business and its competitors;
> (5) the amount of effort or money expended in developing the information; and
> (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180-81 (1997).

A finding with respect to one agreement with one individual relevant to one factor does not dictate the outcome on the ultimate issue—whether information is a

- 20 -

trade secret. All evidence must be considered holistically, and that evidence demonstrates the trade secret status of information Roscigno smuggled from UTC and used at Liquidia. *See supra* at Statement of Facts § I (discussing UTC's methods for safeguarding trade secrets).

### c. Roscigno asks the Court to draw a bright line regarding time-limited confidentiality provisions that is inconsistent with North Carolina law.

Roscigno invites error by asking the Court to create a bright-line rule inconsistent with North Carolina law. Roscigno asks the Court to grant summary judgment based solely on factor three—the extent of measures that UTC took to guard its trade secrets.[4] Yet North Carolina courts balance all factors in determining whether information is trade secret—not just one factor in isolation. *See, e.g.*, *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 594-95 (2014); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 370-71 (2001).

Confidentiality agreements in and of themselves are not dispositive in this fact-dependent, holistic analysis. *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 546 (M.D.N.C. 2002) (applying North Carolina law) ("Although confidentiality agreements are one method used to protect

---

[4] Roscigno does not challenge any of the other relevant factors and, thus, tacitly acknowledges that all other factors cut in UTC's favor. Because Roscigno has not made any argument about those other factors, UTC will focus only on the argument in Roscigno's motion. Nonetheless, Roscigno's apparent concession that the other factors cut in UTC's favor is fatal to his summary judgment motion because failure to make any argument as to the other factors renders such issues uncontested. *Wright v. LoRusso*, 2023 NCBC 64, ¶¶ 18-19, 2023 WL 6128053, at *3 (N.C. Super. Ct. Sept. 19, 2023).

confidential information, they are by no means the sole method."); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC 37, ¶ 36, 2015 WL 1880769, at *8 (N.C. Super. Ct. Apr.23, 2015) ("[A]n employee left free to compete with a former employer, unburdened by restrictive covenants, nonetheless must abide by statutory protections afforded trade secrets.").

North Carolina courts have repeatedly declined to hold that the lack of an NDA is dispositive on the question whether a plaintiff has adequately protected its trade secrets.

- In *Computer Design & Integration, LLC v. Brown*, the court declined to conclude at summary judgment that plaintiff failed to take reasonable measures to maintain the secrecy of its trade secret information where some (but not all) employees signed NDAs, and where some of the NDAs were unenforceable. 2018 NCBC 128, ¶ 87, 2018 WL 6609014, at *17 (N.C. Super. Ct. Dec. 10, 2018) ("[T]rade secret information may be disclosed and remain protected if the evidence shows a 'clear focus on efforts a business took to protect that information.'").

- In *TaiDoc Tech. Corp. v. OK Biotech Co.*, the court declined to conclude at summary judgment that plaintiff failed to take reasonable measures to maintain the secrecy of its trade secret information where the plaintiff had disclosed confidential information before entering into a written NDA with the defendant and had previously provided two pages of its information to a third-party customer without any restrictions on

- 22 -

disclosure.  2016 NCBC 26, ¶ 34, 2016 WL 1221425, at *8 (N.C. Super. Ct. Mar. 28, 2016).

- In *Artistic Southern Inc. v. Lund*, the court denied the defendant's motion for judgment on the pleadings as to the trade secret claims where there was no enforceable NDA between the plaintiff and defendant but the plaintiff had taken other steps to safeguard the information, such as limiting employee access to a "need to know" basis, using computer passwords, and implementing a confidentiality policy.  2015 NCBC 37, ¶ 54, 2015 WL 8476587, at *12.

- In *Safety Test*, the court declined to conclude at summary judgment that plaintiff failed to take reasonable measures to protect trade secret information where it did not obtain restrictive covenants from its employees but took other measures to protect information, such as locking its facilities, monitoring them with video surveillance during nonbusiness hours, and protecting its database with passwords.  2015 WL 1880769, at *12.

- In *Curtiembre Becas, S.A. v. Arpel Leather Corp.*, the court declined to conclude at summary judgment that plaintiff failed to take reasonable measures to protect its trade secret information where the plaintiff had no specific agreements in place to restrict disclosure, but where the information was not publicly available, the plaintiff did not publish the

- 23 -

information, and the plaintiff did not authorize disclosure. No. 1:05CV622, 2007 WL 9751828, at *7 (M.D.N.C. May 2, 2007).

Accordingly, even if the Court were to read Section 10(a) of the 2007 Agreement as Roscigno asserts, the Court should deny the motion for summary judgment because North Carolina courts have repeatedly denied summary judgment in trade secret misappropriation cases even where <u>no</u> confidentiality provision existed but other indicators of trade secret protection measures did.

### d. The North Carolina caselaw cited by Roscigno is inapposite.

Roscigno contends that "North Carolina courts have found alleged trade secrets ineligible for protection when they are disclosed to parties without an obligation to maintain their secrecy." ECF No. 213 at 11. That argument is irrelevant here because Roscigno was obligated to maintain the secrecy of UTC's documents and trade secrets—based on the Employee Handbook, the Technology Policy, and on his employment agreements as explained above. But, even putting aside those obligations, both cases are easily distinguishable from the present case.

*First*, in *Computer Design & Integration, LLC v. Brown*, the court declined to issue a preliminary injunction as to certain asserted trade secrets (organization chart, bonus programs, offer letters, and employment terms) because, *inter alia*, "[p]laintiffs failed to show that these items were subject to reasonable efforts to guard their secrecy," and noted that plaintiffs had not offered any evidence that any employee ever acknowledged, or was even asked to acknowledge, that such information was

- 24 -

confidential and should be maintained as confidential. 2017 NCBC 8, ¶ 72, 2017 WL 442691, at *9 (N.C. Super. Ct. Jan. 27, 2017).

Yet, in the court's subsequent summary judgment opinion (which Roscigno failed to cite), the court declined to conclude as a matter of law that plaintiffs failed to take reasonable measures to maintain the secrecy of their trade secret information where some (but not all) employees signed NDAs, with some NDAs being unenforceable. *Computer Design & Integration, LLC v. Brown*, 2018 NCBC 128, ¶¶ 83-87, 2018 WL 6609014, at *17 (N.C. Super. Ct. Dec. 10, 2018). Accordingly, *Brown* does not support the bright-line rule Roscigno advances.

**Second**, Roscigno quotes a portion of *Safety Test* granting summary judgment as to general trade secret claims the plaintiff asserted over "customer needs and requirements." 2015 NCBC 37, ¶¶ 73-78, 2015 WL 1880769, at *16-17. The plaintiff contended that "its customers do not necessarily know their needs without first consulting with [plaintiff] and thus, the information is not readily ascertainable from the customers themselves." *Id.* ¶ 77. The court noted that there was no record evidence "suggesting that [plaintiff] restricts its customers' use or disclosure of information regarding its needs or its relationship with [plaintiff] once [plaintiff] has discerned those needs on their behalf." *Id.* In other words, as to the alleged trade secrets at issue in the portion of the opinion Roscigno cites, plaintiff provided such information to its customers with seemingly no safeguards whatsoever in place—a scenario readily distinguishable from this case.

- 25 -

By contrast, earlier portions of the *Safety Test* opinion discussing a different trade secret, supplier pricing, did <u>not</u> find the lack of contractual protections from its employees dispositive:

> The Court concludes that Safety Test has demonstrated a record at least strong enough to survive summary judgment. The record demonstrates a combination of efforts, including that Safety Test locks its facilities and monitors them through video surveillance during nonbusiness hours; it has a password-protected database that contains supplier pricing information; it executes written confidentiality agreements with some suppliers; and through its employees' Acknowledgment, it secured a contractual commitment to protect confidential information. Defendants seek to rebut these facts, noting that password access to Safety Test's computer database is freely given, and that Safety Test <u>had the opportunity to but did not obtain contractual protections from its employees</u>, does not have a separate actual written agreement as to confidential information beyond its Employee Manual, and deals with many suppliers for which it does not maintain confidentiality agreements. But again, a jury must resolve the contested facts.

*Id.* ¶ 54 (emphasis added)). Accordingly, *Safety Test* likewise does not support the bright-line rule Roscigno requests.

Isolating Section 10 of Roscigno's 2007 Agreement as the single dispositive factor ignores the many steps that UTC took to protect its trade secret information. Engaging in the holistic, fact-dependent analysis required by North Carolina law precludes holding as a matter of law that UTC failed to make reasonable efforts to protect its trade secrets, especially where the facts and inferences must be viewed in the light most favorable to UTC.

- 26 -

**e.** **Courts in other jurisdictions likewise disfavor a bright-line rule regarding time-limited confidentiality provisions.**

In the absence of North Carolina law that directly supports the bright-line rule that he asks this Court to create, Roscigno ventures abroad. ECF No. 213 at 11-12. The majority of courts outside North Carolina that have considered the question, however, have not applied the rule Roscigno advances here. *See, e.g.*, *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 880 (N.D. Cal. 2018) (stating that "it is not immediately clear" that an expired NDA would bar a trade secret misappropriation claim, because although "the presence of a contract is an allegation that may support a finding of reasonable measures, [] an expired contract does not automatically render any information incapable of receiving trade secret protection."); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, No. CV0800788SJOPJWX, 2009 WL 10671420, at *5 (C.D. Cal. May 22, 2009) (holding that "expiration of the Non-Disclosure Agreement is not dispositive on the issue of reasonable efforts at secrecy" and the jury must decide if a time-limited, expired NDA constituted reasonable measures to maintain secrecy); *FrontRunner HC, Inc. v. Waveland RCM, LLC*, No. CV 20-10230-DJC, 2020 WL 7321161, at *11 (D. Mass. Dec. 11, 2020) (stating that, under both Massachusetts and Minnesota law, courts do not define the scope of a confidential relationship "by looking exclusively to the parties' express agreements").

Nor do the non-North Carolina cases cited by Roscigno support his proposed rule. In *Structured Capital Solutions., LLC v. Commerzbank AG*, the New York court considered alleged trade secrets that were disclosed to third parties (<u>not</u> a company

executive like Roscigno) under a confidentiality agreement that expired one year after it was executed. 177 F. Supp. 3d 816, 835 (S.D.N.Y. 2016). This scenario is unlike the present case where—beyond the 2007 Agreement—Roscigno remained subject to additional restrictions, including the UTC Employee Handbook and UTC Technology Policy.

In *DB Riley, Inc. v. AB Engineering Corp.*, the time-limited confidentiality provisions were one of multiple factors the Massachusetts court considered in determining whether the plaintiff took reasonable steps to preserve the secrecy of its trade secrets. 977 F. Supp. 84, 91 (D. Mass. 1997) (noting, inter alia, that there was an unwritten informal policy that overrode formal policy and that at-issue documents were "distributed haphazardly to both customers and parts suppliers for years") (applying Massachusetts law).[5] Here, UTC had layered measures to protect its trade secrets beyond its confidentiality agreements.

In *CT Int'l, Inc. v. Zwerlein*, there is no indication that—as is the case here— the plaintiff came forward with other evidence of its efforts to protect its trade secrets, as the Wisconsin opinion analyzes the confidentiality agreement in isolation. 228 Wis. 2d 343, 355 (1999).

Ruling in Roscigno's favor would require the Court to depart from precedent in North Carolina and other jurisdictions where courts have declined to draw bright-line rules regarding time-limited confidentiality provisions. It would also stretch the

---

[5] *Accord FrontRunner HC*, 2020 WL 7321161, at *11 (stating that, under Massachusetts law, courts do not define the scope of a confidential relationship "by looking exclusively to the parties' express agreements.").

non-binding precedent Roscigno cites beyond the fact-bound scenarios considered in those cases.

## V. Roscigno's remaining arguments depend on a faulty interpretation of the 2007 Agreement.

Finally, in conclusory fashion, Roscigno argues that UTC cannot otherwise establish misappropriation or damages. Roscigno's *ipse dixit* argument assumes as a predicate that the Court agrees with his interpretation of the 2007 Agreement.

***First***, as to misappropriation, Roscigno contends that the 2007 Agreement provided him with express or implied consent to misappropriate UTC's trade secrets. ECF No. 213 at 15-19. Roscigno had no such authority. *See, e.g.*, Rothblatt Aff. ¶¶ 7-10 (SJ1526-1527). Roscigno's misappropriation began when he departed from UTC in 2007 with the trade secrets he acquired without UTC's authority. N.C. Gen. Stat. § 66-152(1). As detailed above, the 2007 Agreement, UTC Employee Handbook, and UTC Technology Policy make plain that these trade secrets belonged to UTC, not to Roscigno, that he needed to return the material when he departed UTC, that the UTC materials could only be used in UTC's interest, and that Roscigno had an ongoing duty to maintain their confidential nature.

Far from providing Roscigno with consent to misappropriate its trade secrets, the 2007 Agreement created an ongoing obligation for Roscigno to take "whatever steps are necessary to sustain United Therapeutics' claim to its trade secrets, including but not limited to . . . maintaining the confidential nature of such trade secrets." *See supra* Argument Section IV. The only North Carolina case that Roscigno cites for his express or implied consent argument is *Aeroflow Inc. v. Arias*,

2011 NCBC 20, 2011 WL 2651567 (N.C. Super. Ct. July 5, 2011). *Aeroflow* is of limited utility. It is a preliminary injunction opinion that did not consider a time-limited NDA and did not involve a comprehensive set of other measures the plaintiff took to secure its trade secrets.

**Second**, as to damages, Roscigno contends that UTC cannot prove damages because it cannot establish misappropriation, and that UTC cannot establish that its damages were proximately caused by Roscigno's misappropriation. These arguments likewise depend on a misreading of the 2007 Agreement. As laid out in the Employee Handbook, the Technology Policy, and his employment agreements, UTC never gave Roscigno consent to misappropriate its trade secrets. *Accord* Rothblatt Aff. ¶¶ 7-10 (SJ1526-1527). Roscigno was prohibited from keeping UTC's trade secrets when he left the company, and he was prohibited from disclosing those trade secrets in the course of his employment at Liquidia. *See supra* Argument Sections II, IV.

UTC was harmed by Roscigno's misappropriation of trade secret information, which maintained value from his initial misappropriation in 2007 to present. *See, e.g.*, Jeffrey A. Stec, Ph.D. Rep. at 61-87 (SJ1023) (analyzing unjust enrichment and reasonable royalty damages calculations); Troy Rep. ¶¶ 50-77 (SJ675) (detailing the value of UTC's trade secrets to both UTC and Defendants); Feigal Rep. ¶¶ 105-267, pp. 87-91 (SJ753) (detailing damage in the form of time saved by UTC's competitor, Liquidia); Bell Rep. ¶¶ 34-47 (SJ902) (discussing the value of the misappropriated trade secrets). Roscigno's express or implied consent argument and his damages

argument should be seen for what they are: half-hearted attempts to avoid liability for his wrongful acts.  Those arguments should be rejected.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Roscigno's Motion for Summary Judgment.

Respectfully submitted this the 6th day of March, 2024.

/s/ Eric M. David
Jim W. Phillips, Jr.
N.C. State Bar No. 12516
jphillips@brookspierce.com
Eric M. David
N.C. State Bar No. 38118
edavid@brookspierce.com
Kasi W. Robinson
N.C. State Bar No. 52439
krobinson@brookspierce.com
**BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.**
Suite 2000 Renaissance Plaza
230 North Elm Street
Greensboro, NC 27401
Telephone: (336) 373-8850

William C. Jackson (*pro hac vice*)
WJackson@goodwinlaw.com
**GOODWIN PROCTER LLP**
1900 N Street NW
Washington, DC 20036
Telephone: (202) 346-4216

Douglas H. Carsten (*pro hac vice*)
Dcarsten@mwe.com
Art Dykhuis (*pro hac vice*)
Adykhuis@mwe.com
Kathy Pappas (*pro hac vice*)
Kpappas@mwe.com
Courtney Seams (*pro hac vice*)
Cseams@mwe.com
Lillian Spetrino (*pro hac vice*)
Lspetrino@mwe.com
Joshua Revilla (*pro hac vice*)
Jrevilla@mwe.com
**MCDERMOTT WILL & EMERY LLP**
18565 Jamboree Road, Suite 250
Irvine, CA 92612
Telephone: (949) 851-0633

*Attorneys for Plaintiffs*

- 32 -

## RULE 7.8 WORD COUNT CERTIFICATION

Pursuant to BCR 7.8, the undersigned hereby certifies that the foregoing brief is less than 7,500 words (excluding caption, any index, table of contents, table of authorities, signature blocks, and any required certificates) as reported by word-processing software.

/s/ Eric M. David
Eric M. David

## CERTIFICATE OF SERVICE

This certifies that I have this day electronically filed the foregoing document with the North Carolina Business Court, which will serve all counsel of record in accordance with BCR 3.9(a).

This the 6th day of March, 2024.

/s/ Eric M. David
Eric M. David

- 33 -